**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

ROBERT SIEGMAN,

      Plaintiff,

        v.

SCHNEIDER ELECTRIC UNITED
STATES, et al.,

      Defendants.

Civil No. 15-7072 (RMB/AMD)

**OPINION**

APPEARANCES:

ROSSETTI & DEVOTO, P.C.
By:  Andrew J. Rossetti, Esq.
20 Brace Road, Suite 115
Cherry Hill, New Jersey 08034
    *Attorney for Plaintiff Robert Siegman*

SCHNADER HARRISON SEGAL & LEWIS LLP
By:  Carl J. Schaerf, Esq.
140 Broadway, Suite 3100
New York, New York 10005
    *Attorneys for Defendants Schneider Electric United States
    and Schneider Electric*

**BUMB**, UNITED STATES DISTRICT JUDGE:

Plaintiff Robert Siegman, an electrician, was severely burned by an arc flash emitted from a live electrical transformer at the Federal Aviation Administration's ("FAA") Technical Center in Atlantic City.  Defendants Schneider Electric United States, Schneider Electric, and Schneider

Electric d/b/a Square D (collectively, "Schneider Electric")

designed the transformer.[1]  Plaintiff alleges that his injuries

could have been prevented by feasible design changes that

Defendant Schneider Electric should have implemented.

Discovery is now complete.  Schneider Electric moves for

summary judgment asserting that the government contractor

defense set forth by the United States Supreme Court in Boyle v.

United Technologies Corp., 487 U.S. 500 (1988) precludes a

finding of liability.  The Court agrees.

For the reasons stated herein, the Motion for Summary

Judgment will be granted.[2]

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

On November 14, 2013, Plaintiff Siegman was working for his

employer, Scalfo Electric, Inc., at the FAA Tech Center

Substation Number 2 when the accident occurred.  (Schaerf Aff.

---

[1]  The Complaint also names Plaintiff's employer, Scalfo
Electric Inc., as a Defendant for "discovery only."  The
Complaint expressly states that, "at this time it appears that
any direct claim by plaintiff would be barred by the workers
compensation bar." (Compl., Count 4, ¶ 4)  The Court has no
record of Scalfo Electric having been served with process in
this action, and no attorney has entered an appearance on behalf
of Scalfo Electric.

[2]  Schnedier also argues: (1) Siegman's expert witness
should be disqualified under a Daubert analysis; and (2)
Siegman's evidence fails to raise an issue of material fact as
to causation.  In light of the Court's decision concerning the
government contractor defense, the Court does not reach these
arguments.

Ex. K)  Plaintiff testified at his deposition that he "has no

recollection of" what happened.  (Siegman Dep. p. 16)  Scalfo

Electric's Incident Report (Schaerf Aff. Ex. K) states the

following:

> The employee was working on the left-hand side of the
> new Substation No. 2 electrical equipment making final
> bus link connections between the transformer and 208
> volt switchgear.  The left-hand side of the new
> equipment was de-energized and lockout – tagout
> devices were applied.  For unknown reasons the
> employee decided to open the enclosure door for the
> transformer (right-hand side) of the new Substation
> No. 2, which was energized.  The employee accidentally
> came in contact with an energized exposed conductor
> and an arc-flash occurred resulting in the employee
> receiving significant burn injury [sic].
>
> The employee did not follow the proper procedures /
> protocol for the work activity.  He was not authorized
> to open the energized transformer enclosure.  He did
> not have the necessary written procedure for that work
> activity.  He did not wear the appropriate arc-rated
> PPE.

(Schaerf Aff. Ex. K).

> The FAA's post-incident investigation report states,
>
> To enter the [energized transformer] cabinet
> [Siegman] would have had to loosen the four bolts that
> secure the door and then turn the handle to release
> the door to open it.  When [Siegman] stepped into the
> cabinet contact was made with the transformer tap and
> the cabinet causing the arch [sic] flash to occur and
> tripping the two medium voltage breakers for that
> transformer.

(Rosetti Cert. Ex. E)

Siegman was working pursuant to Scalfo Electric's contract

with the FAA to install the subject medium voltage cast coil

dry-type transformer designed by Defendant Schneider Electric. (Antweiler 05/18/16 Dep. p. 9; Lesnieski Dep. p. 7)  The specific area where Siegman was working was not open to the public; only "trained personnel" who have been given "access to that area" could enter.  (Duffy Dep. p. 22-23)

Schneider's witness, James Antweiler[3], explained the company's general design process: "When [Schneider] receive[s] an order for a transformer we process the order.  The order would go to whoever our supplier is, in this case ABB.  And then [it] would manufacture the transformer per the customer's specifications and our specifications."  (Antweiler 05/18/16 Dep. p. 17)

With respect to the specific design process that occurred between Schneider and the FAA, Antweiler further testified,

Q:  . . . How are [FAA specifications] and [Schneider specifications] different?

A:  Our specifications are general specifications that apply to all transformers that we buy.  And then the FAA specifications are specific to the job.  And that would be the voltages required, the impedances required, the size of the transformer required, all those things that apply to the specific end user.

. . .

Q:  With regard to the specification for the doors [on the transformer], the type of doors, the type of

_____

[3]  Mr. Antweiler was deposed twice, once on May 18, 2016 as a fact witness, and then again on February 14, 2017 as an expert witness.

hinges, the handles, whose specs [sic] do they fall
    under?

    A:  That would be the FAA.

    Q:  So, the FAA specifies what type hinges they want
    on their door?

    A:  No. . . . They would specify whether they want
    doors or just removable panels.

(Id. at p. 18)

    Siegman's design defect theory is that the transformer's

design should have included a "Kirk Key" which prevents access

to the inner workings of an energized transformer.[4]  Antweiler's

<u>uncontroverted</u> testimony, however, is that the decision to

include such a device on the door of a transformer "[is]

specified by the end user," here the FAA.  (Antweiler 05/18/16

Dep. p. 24)  Antweiler explained, "we provide interlocks when

the user tells us [it] want[s] interlocks and then we provide

---

    [4]  A Kirk Key is a brand name for a mechanical interlock
system which requires the user to turn off the power source with
a key before the same key will unlock the access door to the
transformer. (Antweiler 05/18/16 Dep. p. 22-23)
    Apparently as a secondary argument, Siegman also asserts
that Schneider Electric should have included another safety
device, such as an audible alarm, that would have prevent
someone like Plaintiff from accessing a live transformer. (See
Opposition Brief, p. 16, 24)  Although the Court's analysis of
the government contractor defense is not dependent upon the
specific safety device proposed by Siegman, the Court's
discussion focuses on the proposed Kirk Key system because that
system was clearly the focal point in deposition questioning.
However, this opinion should not be misunderstood to be limited
to Kirk Key systems.  Rather, the opinion encompasses all
alternative safety designs Plaintiff contends should have been
made.

[it] with the interlocking of different devices depending on how the user wants to shut [its] system down or do maintenance on the system." (Antweiler 02/14/2017 Dep. p. 10) Notably, Siegman also testified that the FAA "would give the final say" with regard to "any choices as to any safety devices, interlocks, any Kirk Keys, anything like that." (Siegman Dep. p. 54)

It is <u>undisputed</u> that the FAA did not include a request for a Kirk Key, or any other similar safety device, in its specification for the transformer at issue. (Lesnieski Dep. p. 8, 13-14, 17, 24, 27-28, 34; Antweiler 05/18/16 Dep. p. 25)(See also Plaintiff's Opposition Brief, p. 21) Joseph Lesnieski was the FAA's "contracting officer representative" and "resident engineer," for the Scalfo Electric contract. (Lesnieski Dep. p. 15) He drafted the specification at issue. (Id. at p. 5-7) As Lesnieski testified, "I've been in the trade for 43 years and have been involved with [K]irk [K]ey systems on numerous pieces of equipment." (Id. at p. 8) "I personally have never seen [K]irk [K]eys on a transformer cabinet inside a locked location [such as the location where Siegman was injured]." (Id. at p. 12) Lesnieski explained that the specification did not require a Kirk Key "simply because . . . it was not required by the national electric safety code or any of the other referencing standards." (Id. at p. 17) According to Lesnieski, those

industry safety standards only call for Kirk Key-type devices

when the "general public or non-qualified individuals have

access to the areas."  (Id. at p. 12-13)

Lesnieski further testified,

Q:  As an experienced specifier of equipment, were
you aware of the risks of arc flashing for this
specification as issued?

A:  Yes, I have been, you know appraised [sic] of arc
flash because of industry accident standards for . .
. [p]robably at least 20 years.  I mean naturally I
knew about it before then, but it was not enforced as
much.

Q:  But for at least the last 20 years, you have been
informed about arc flash?

A:  Yes.

Q:  Did you need any sort of training from Schneider
Electric as to the risks of arc flash?

A:  No.  No, I did not need any specialized training.
We have our own FAA training.

(Lesnieski Dep. p. 25)

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if "the movant shows that

there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  A fact is "material" if it will "affect the

outcome of the suit under the governing law[.]"  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is

"genuine" if it could lead a "reasonable jury [to] return a

verdict for the nonmoving party." Id.

In determining the existence of a genuine dispute of

material fact, a court's role is not to weigh the evidence; all

reasonable "inferences, doubts, and issues of credibility should

be resolved against the moving party." Meyer v. Riegel Prods.

Corps., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, a mere

"scintilla of evidence," without more, will not give rise to a

genuine dispute for trial. Anderson, 477 U.S. at 252.

Moreover, a court need not adopt the version of facts asserted

by the nonmoving party if those facts are "utterly discredited

by the record [so] that no reasonable jury" could believe them.

Scott v. Harris, 550 U.S. 372, 380 (2007). In the face of such

evidence, summary judgment is still appropriate "where the

record . . . could not lead a rational trier of fact to find for

the nonmoving party[.]" Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of

informing the district court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions,

answers to interrogatories, and admissions on file, together

with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ.

P. 56(c)).  Then, "when a properly supported motion for summary

judgment [has been] made, the adverse party 'must set forth

specific facts showing that there is a genuine issue for

trial.'"  Anderson, 477 U.S. at 250 (citing Fed. R. Civ.

P. 56(e)).  In the face of a properly supported motion for

summary judgment, the nonmovant's burden is rigorous: she "must

point to concrete evidence in the record"; mere allegations,

conclusions, conjecture, and speculation will not defeat summary

judgment.  Orsatti v. New Jersey State Police, 71 F.3d 480, 484

(3d Cir. 1995); accord, Jackson v. Danberg, 594 F.3d 210, 227

(3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs.,

Inc., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and

conjecture may not defeat summary judgment.")).

**III. ANALYSIS**

In Boyle, the Supreme Court held, as a matter of federal

common law, "liability for design defects cannot be imposed,

pursuant to state law, when (1) the United States approved

reasonably precise specifications; (2) the equipment conformed

to those specifications; and (3) the supplier warned the United

States about the dangers in the use of the equipment that were

known to the supplier but not to the United States."  487 U.S.

500, 512 (1988).[5]  When all three elements are established,

---

[5]  See also, Crespo v. Unisys Corp., 1996 WL 875565 at *8
(D.N.J. 1996) (Bassler, D.J.) ("The Boyle test boils down to

9

federal common law preempts state law design defect claims and
those claims must be dismissed.  Id. at 504;  see also, Carley
v. Wheeled Coach, 991 F.2d 1117, 1128 (3d Cir. 1993), cert.
denied, 510 U.S. 868 (1993) ("If [defendant] establishes at
trial that it satisfied the third prong of the government
contractor defense, then federal common law preempts state law
and [defendant] is not liable for the alleged design defect.").[6]
Although Boyle involved defects in equipment procured pursuant
to a military contract, the law is well-settled in the Third
Circuit that the Boyle defense "applies to both military and
nonmilitary contractors."  Carley, 991 F.2d at 1119.

   "The defendant bears the burden of proving each element of
the defense.  Where a defendant has moved for summary judgment,
it must establish that there is no genuine issue of material

_____

three elements: approval, conformance, and relative
knowledge.").

   [6]  The basic principle supporting the Boyle defense is that
sovereign immunity should extend to private contractors who
simply implement design decisions made by the United States.
See Boyle, 487 U.S. at 512 ("It makes little sense to insulate
the Government against financial liability for the [decision]
that a particular feature of military equipment is necessary
when the Government produces the equipment itself, but not when
it contracts for the production."); Maguire v. Hughes Aircraft
Corp., 912 F.2d 67, 70 (3d Cir. 1990)("The Supreme Court in
large measure based the identification of a government
contractor defense at federal common law upon the contours of
the discretionary function exception to liability under the
Federal Tort Claims Act.").

fact as to each element of the defense." Carley, 991 F.2d at 1125. The Court now turns to the three elements necessary for the government contractor defense to apply.

**A.** **"Approved reasonably precise specifications"**

First, "it is necessary only that the government approve, rather than create, the specifications" for the government contractor defense to apply. Carley, 991 F.2d at 1125. Stated differently, "[t]he government contractor defense is available to a contractor that participates in the design of the product, so long as the government's approval consists of more than a mere rubber stamp." Maguire, 912 F.2d at 71-72.

The record is clear and uncontroverted: the decision whether to include a Kirk Key interlock was the FAA's decision to make. (Siegman Dep. p. 54; Antweiler 05/18/16 Dep. p. 24; Antweiler 02/14/2017 Dep. p. 10) Indeed, the FAA did make the decision. Mr. Lesnieski, the FAA employee who drafted the specification, explained his reasoning for not requiring a Kirk Key. In his extensive electrical engineering experience, he had never seen a Kirk Key on a transformer in a non-public limited access location (Lesnieski Dep p. 8-9, 12-14), and he chose not to require one in the specification at issue because he believed no industry safety standard required it. (Lesnieski Dep. p. 12-14, 16-17)

Relying on Antweiler's deposition testimony that the specification did not require any sort of safety device, Plaintiff draws the inference that the FAA must have left to Schneider Electric's discretion the decision whether to include a Kirk Key or other similar device. Such an inference cannot be reasonably drawn, however, in light of Siegman's and Lesnieski's contrary testimony, which Plaintiff's opposition ignores.

On the record before this Court, a reasonable factfinder could only conclude that the government did not simply rubber stamp Schneider's decision to omit a Kirk Key; on the contrary, the government, not Schneider, made a reasoned decision not to require a Kirk Key. Accordingly, the Court holds that the first prong of the Boyle test is met.

B. **Conformity**

As to the second prong, Plaintiff does not argue that the transformer did not conform to the specification and, as such, does not seriously contend this prong. The record evidence conclusively establishes conformity: the specification did not require a Kirk Key or any other similar safety device, and the transformer sold by Schneider did not have any such device. Moreover, Lesnieski testified that the transformer conformed to the specification. (Lesnieski Dep. p. 24-25)

Accordingly, the Court holds that the second prong of the Boyle test is met.

## C. **Warned of dangers not known to the government**

Turning to the third prong, Siegman extensively quotes deposition testimony that Schneider Electric did not warn or "educate" the government about the asserted dangers of omitting a safety interlock device such as a Kirk Key. (Opposition Brief, Dkt. No. 24, p. 24-25) According to Siegman, this evidence is sufficient to raise a fact issue with regard to the third prong of the Boyle test. The Court disagrees.

The law is clear: a government contractor must only warn of dangers that are "known to the supplier but not to the United States." Carley, 991 F.2d at 1126 (citing Boyle) (emphasis added). Only when the contractor is "more aware than the government" of the danger, must the contractor warn in order to obtain Boyle protection. Id.; see also Crespo, 1996 WL 875565 at *8 (describing the third prong of the Boyle test as "relative knowledge").

No reasonable factfinder could conclude on this record that Schneider Electric was more aware than the FAA about Kirk Keys and the danger of arc flashes. Lesnieski's above-quoted testimony is unequivocal. He had known about the risk of arc flashes for more than 20 years; he did not need such information from Schneider Electric; the FAA provided its own training. (Lesnieski Dep. p. 25) Indeed, Plaintiff fails to point to any contrary evidence. At most, Plaintiff's evidence supports a

conclusion that Schneider Electric did not warn the FAA of the risks of arc flashes, but that fact is not dispositive because the relevant inquiry is not simply whether or not the government was warned, but rather, relative knowledge.

In this regard, this case is analogous to Stout v. Borg-Warner Corp., 933 F.2d 331 (5th Cir. 1991), cert. denied, 502 U.S. 981 (1991).  In Stout, an air conditioning repair man was injured when he reached into an operating unit and caught his hand in the rotating blades of the condenser fan.  Id. at 332.  Stout argued that the air conditioning unit was defectively designed "because there was no safety device that would prevent contact with the condenser fan while the unit was in operation."  Id. at 333-34.

In affirming the district court's grant of summary judgment based on the government contractor defense, the Fifth Circuit held that the third prong of the Boyle test was established for two independent reasons.  First, the Court explained, the contractor "only had the duty to warn the government of dangers which the government had no knowledge."  Stout, 933 F.2d at 336.  The record in Stout, the Court held, "demonstrate[d] undisputed knowledge of the risk of repairing the unit in this manner."  Id. at 337.

Second, the Court stated, the record established that "the danger of coming into contact with the blades of the fan was

14

obvious to anyone who observed the air conditioner in operation.

The unit was so powerful that it would propel any object placed

on the fan outlet like a shell from a cannon." Stout, 933 F.2d

at 337. Based on this evidence, the Court held that "there was

no need for [the contractor] to communicate this warning for the

government contractor defense to apply" because "the Army must

be charged with knowledge of the obvious risk that the exposed

fan posed." Id.

The Court finds Stout's analysis applicable to this case on

both points. First, the undisputed record demonstrates that the

FAA knew the dangers associated with opening an energized

transformer. Lesnieski's deposition testimony conclusively

establishes this fact. (Lesnieski Dep. p. 25) Additionally,

Siegman also testified:

> Q: Did you need warnings on machinery to tell you
> [the] hazards [relating to arc flashes]?
>
> A: At the FAA they have stickers posted on all the
> gear, and tell you how far away you need to be if
> [the transformer is] exposed, if the door is open.
>
> . . .
>
> Q: Did the transformer cabinet in which you were
> injured have a proximity warning on it?
>
> A: I don't think it had a proximity warning on it.
> But it did have, you know, exposed live parts can
> cause injury, those types of stickers.

(Siegman Dep. p. 13); accord. Stout, 933 F.2d at 337

("[plaintiff] admitted in his deposition testimony that [he was]

15

specifically warned not to get his hand caught in the fan while performing repairs.").

Second, the dangers of opening a live transformer are equally, if not more, apparent as the danger of reaching into an exposed fan outlet. The record in this case establishes that the dangers of arc flashes were common knowledge in the electrical engineering field. (See, e.g., Lesnieski Dep. p. 25, Antweiler 05/18/16 Dep. p. 15-17, 21) Thus the Court holds that the third and final prong of the Boyle test is met.

Accordingly, because there are no genuine disputes of material fact as to the three Boyle elements, Schneider Electric is entitled to summary judgment as to the government contractor defense.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted. An appropriate Order shall issue on this date.

s/ Renée Marie Bumb

Dated: November 17, 2017

RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE